On Application for Rehearing
The opinion of this court issued August 22, 2003, is withdrawn, and the following is substituted therefor.
John Newton Godwin ("the father") and Nora Marie Godwin Balderamos ("the mother") were divorced in 1996; one of the alleged causes of the divorce was the father's extramarital affair. The parties' son was an infant when they separated in May 1996. After mediation, the parties entered into a separation agreement that was incorporated into the divorce judgment entered by the court. However, one portion of the divorce judgment contains provisions different than those in the separation agreement.
The divorce judgment awarded the parties joint legal custody of the son, with the mother having sole physical custody. In addition, it awarded to the mother the right to make all day-to-day decisions affecting the son, and, in the case of a disagreement between the parents, it awarded to the mother "final say" on all medical, religious, civic, and cultural issues. The father was awarded "final say" on all academic, athletic, and legal issues. The parties' separation agreement, however, only addressed who had final decision-making authority on religious and athletic issues.
Despite the acrimonious circumstances under which the parties separated, they worked admirably well together as parents for their young son. The father exercised very generous visitation privileges, took care of the son when the mother took trips on weekends that were not the father's scheduled weekends for visitation, and assisted with transportation to and from day care as needed. The son is well-adjusted and happy, and, until the mother decided to remarry and move to the Cayman Islands, the parties were apparently happy with their custody arrangement.
The mother met Frank Balderamos at a wedding on Grand Cayman in November 2000. They first engaged in a long-distance friendship, communicating via e-mail and by telephone; they began visiting each other as the relationship became romantic. The mother planned to take the son on a trip to the Cayman Islands in August 2001.
The father learned of the mother's relationship and "heard a rumor" sometime in the summer of 2001 that the mother was contemplating relocating to the Cayman Islands. He filed a petition to modify custody and a motion for an ex parte restraining order in July 2001, alleging that the mother was planning to leave the country with the son, requesting a restraining order to prevent the mother from removing the son from Birmingham, and requesting that the parties be awarded joint physical custody because, he alleged, that had been the practice of the parties for several years. In October 2001, the mother testified in a deposition taken in relation to the father's July petition that she was not planning to move to the Cayman Islands. The father and the mother entered into a consent judgment in December 2001. That consent judgment contained a provision requiring either party to give the other party 45 days' notice of an intent to move more than 30 miles from Birmingham. In addition, the consent judgment made substantial changes to the visitation provisions of the original divorce judgment.
In November 2001, the mother and Balderamos became engaged. In January 2002, the mother notified the father that she and Balderamos would be married in June 2002 and that she and the son would be moving to Grand Cayman to live with her new husband. The father objected and refused to assist the mother with *Page 1172 
obtaining a passport for the son. The mother then filed a motion to require the father to execute the necessary documents to obtain a passport for the son. The father filed a second petition to modify custody and a contempt petition, alleging in the contempt petition that the mother's actions in deciding to move to Grand Cayman and to enroll the son in school there violated the provision in the divorce judgment granting the father the "final say" on academic and athletic issues.
Before trial, and before her wedding in June 2002, the mother relocated to Montgomery, where she moved in with her parents. According to the mother and Balderamos, Balderamos was willing to resign from his position as a finance manager at a private bank on Grand Cayman and to seek a similar position in the Southeastern United States if the trial court refused to permit the mother and son to move to Grand Cayman. Although she had enrolled the son in school on Grand Cayman, the mother also enrolled the son in school in Montgomery because she was unable to relocate until the trial court decided the case. At the time of the trial, the school year had not yet begun.
After a trial, the trial court entered a judgment denying the father's contempt petition and denying the modification petition, but restraining the mother from moving with the son to the Cayman Islands. After considering postjudgment motions, the trial court amended the divorce judgment by granting the father "final say" on only athletic issues and by setting out two minimum visitation schedules — one to be used if the mother and son continued to reside in Alabama, the other to be used if they moved out of the state. Either visitation schedule reduces the amount of visitation the father will have with the son.
The father appeals.[1] He argues that the trial court used the wrong standard in determining whether to modify custody and that the trial court wrongfully based its reduction of the father's access to the son on the father's predivorce conduct. He also argues that the trial court erred by not enforcing the provision of the original divorce judgment granting him "final say" on academic matters and in failing to enforce what he calls a "geographic restriction" in the December 2001 consent judgment. We affirm.
The father first argues that the trial court incorrectly applied the Exparte McLendon, 455 So.2d 863 (Ala. 1984), standard in determining whether to modify custody. He argues that the "best interest" standard applies because this case involves a "custody dispute arising out of relocation" issues; he cites Murphy v. Murphy, 479 So.2d 1261 (Ala.Civ.App. 1985), and Ex parte Couch, 521 So.2d 987 (Ala. 1988), in support of this proposition. Murphy did not involve a request for modification of custody; instead, it involved whether the custodial parent should be permitted to relocate in light of the parties' settlement agreement, which required the child to live within Tuscaloosa County unless the parents agreed upon or received judicial approval of a proposed relocation.Murphy, 479 So.2d at 1262.
In Murphy, this court noted that a parent requesting a change of custody from one parent to the other must meet the Ex parte McLendon
standard. Id. at 1263. However, this court further explained that the issue at hand was not a change of custody, but instead an approval of a change of residence proposed by the custodial parent. Id. Thus, this court concluded that the trial court correctly granted the mother permission to relocate because *Page 1173 
"under these facts, the trial court should be guided by the bestinterests of the child." Id.
While the facts of this case are similar to those in Murphy, the holding in Murphy is inapposite to the father's argument on appeal. The father here sought not only to prevent a relocation, which might properly be reviewed under the best-interest standard, but to change custody on the basis of the mother's expressed intent to relocate to Grand Cayman and upon her intermediate move to Montgomery. Even the Murphy court states that such a request is properly reviewed, in light of the award of physical custody to the mother, under the Ex parte McLendon standard. Id.
at 1263.
Likewise, we find the father's reliance on Ex parte Couch misplaced. While Ex parte Couch involved a move from Alabama to New York, the court was more focused on determining whether Ex parte McLendon standard or the "best interest" standard applied to the custody-modification request that was based upon the mother's argument that the father had relinquished his right to "shared physical custody" under the parties' separation agreement, which had been incorporated into the divorce judgment, by permitting the children to be in her physical custody since only a few months after the divorce. Ex parte Couch, 521 So.2d at 989. The supreme court commented that the father's agreement to allow the children to remain in the mother's custody suited the parties' and the children's best interest at the time. Id. The court also said that it did not wish to discourage parents from agreeing to an informal arrangement pertaining to custody, as circumstances and the best interests of the family dictated. Id. at 990. Thus, the court decided that the father's actions, however inconsistent with his right to insist on "shared physical custody," did not require application of the Ex parte McLendon standard because the divorce judgment incorporating the parties' separation agreement did not favor one parent over the other. Id. The Ex parteCouch court did discuss how the policy considerations of Ex parteMcLendon might be impacted by the facts of that particular case. Id.
However, those statements, in light of the fact that the court clearly held in two separate portions of the opinion that Ex parte McLendon did not apply to the case, see Ex parte Couch at 989 and 990, were dicta.
The mother correctly points out that this court and our supreme court have consistently applied Ex parte McLendon standard to cases involving a request for a custody modification on the basis of an intended (or even completed) relocation of a custodial parent when the prior judgment favored one parent with sole physical custody of the children. Ex parteBryowsky, 676 So.2d 1322 (Ala. 1996); G.R.V. v. M.V., 825 So.2d 116
(Ala.Civ.App. 2001); and Scacca v. Scacca, 694 So.2d 1 (Ala.Civ.App. 1997). In fact, as the mother argues, Ex parte Bryowsky is indeed more applicable to this case than Ex parte Couch. In Ex parte Bryowsky, our supreme court reversed this court's reversal of a trial court's judgment denying a modification of custody on the basis of a custodial mother's intended move to Mississippi. Ex parte Bryowsky, 676 So.2d at 1324. This court had determined that, pursuant to Ex parte Couch, the correct standard to be applied to the father's modification petition was the "best interest" standard. Gann v. Bryowsky, 676 So.2d 1317, 1319
(Ala.Civ.App. 1995). In its opinion reversing this court, the supreme court explained succinctly:
 "The Court of Civil Appeals correctly noted that the McLendon standard does not always apply in joint custody *Page 1174 
situations. However, Ex parte Couch involved joint legal custody and shared physical custody of the children where no judicial determination had been made preferring either parent. Therefore, when the father in Ex parte Couch sought custody, we applied the `best interest of the child' standard because under the particular facts of that case both parents were on equal ground in attempting to gain custody of the children. In the present case, the parties had joint legal custody, but a previous judicial determination had granted physical custody to the mother. This distinguishes this case from Ex parte Couch."
Ex parte Bryowsky, 676 So.2d at 1325. Thus, we disagree with the father's argument that the trial court erred by requiring him to satisfy the burden imposed under Ex parte McLendon.
The father does not argue that he met the Ex parte McLendon standard. Our review of the evidence presented convinces us that it supports the trial court's conclusion that the father did not meet that burden. As the mother noted in her brief, "[a] change in the custodial parent's residence is only one factor to be considered in determining the outcome of a modification petition and does not necessarily justify a change in custody." Scacca, 694 So.2d at 4. The trial court in the present case was presented with and considered a myriad of evidence concerning the parties' actions and motivations and the son's best interests; its conclusion based upon that evidence is entitled to great weight on appeal. Ex parteBryowsky, 676 So.2d at 1326.
The father next argues that the trial court improperly considered evidence concerning his fault in the breakdown of the marriage and that it punished him for his extramarital affair by reducing the amount of time he is permitted to spend with his son. The father is simply incorrect in arguing that the trial court was precluded, in a case such as this where the divorce was never tried, from hearing evidence of the parties' predivorce conduct. C.P. v. W.M., 806 So.2d 395, 396-97
(Ala.Civ.App. 2001); Blume v. Durrett, 703 So.2d 986, 988-89
(Ala.Civ.App. 1997). In addition, the father argues that comments by the trial court to the effect that the father's choice to divorce the mother would have as a consequence a reduction in the time he could spend with his son and a decrease in their physical proximity indicate a desire on the part of the trial court to punish the father for "causing" the divorce by carrying on an extramarital affair during the mother's pregnancy and postpartum recovery; however, we do not read the trial court's comments as being that pointed. The trial court was merely stating the obvious societal reality of divorce — that all divorces result in changes in a family's physical proximity and in the family's actual time spent together. In fact, the trial court refers to the loss of physical proximity as not only being a price the father might have to pay but as being one which he has already paid. In making its comments, the trial court was stating a universally known truth — that divorce has far-reaching consequences that impact every aspect of the future relationships between divorced parents and their children.
The father also appears to argue that the trial court's establishing visitation schedules that are dependent upon the mother and son's location is an abuse of its discretion; we see no reason to reverse the trial court's judgment on this basis. The long-standing principle that a trial court has broad discretion in visitation matters applies to visitation-modification proceedings as well as original visitation determinations. Flanagan v. Flanagan, 656 So.2d 1228, 1230 (Ala.Civ.App. 1995); Wallace v. Wallace, 485 So.2d 740, 741 (Ala.Civ.App. *Page 1175 
1986). Although the mother and son's relocation away from Birmingham will reduce the father's contact with the son, the trial court did not abuse its discretion in "reducing" the father's visitation when it fashioned a reasonable visitation schedule for parents who, at the time of trial, lived one and one-half hours away from each other.
Finally, the father argues that the trial court erred by failing to enforce the provisions on the original divorce judgment granting him "final say" on academic matters and in failing to enforce what the father calls a "geographic restriction" in the December 2001 consent judgment. Those two arguments are interdependent because, according to the father, his authority over academic matters coupled with the 30-mile relocation-notification provision essentially formed a geographic restriction that assured him of having his son live in close proximity to him so that he could continue to be heavily involved in his son's life. In its amended judgment, the trial court, at the request of the mother, removed the father's "final say" over academic matters. Therefore, although the mother registered the son for school in both Grand Cayman and Montgomery against the father's wishes before the trial, that particular issue is now moot. The father no longer has "final say" over academic matters, and he never had a geographic restriction preventing the mother and son from moving away from Birmingham.
Even if we were to agree with the father's argument that the two provisions somehow "effectively imposed a geographic restriction," we note that the trial court was not required to enforce that restriction. A geographic restriction may be upheld when the restriction promotes or protects the best interest of the child. Cohn v. Cohn, 658 So.2d 479,481-82 (Ala.Civ.App. 1994). "To find that a child must remain in one geographic area is a mere speculation of what the best interest of the child may be at a future date." Wheeler v. Wheeler, 585 So.2d 51, 52
(Ala.Civ.App. 1991). "An agreement that a child must remain in one area is conclusive of the child's best interest only as long as the status of the parties at the time remains unchanged." Wheeler, 585 So.2d at 52. When the restriction no longer serves the best interests of the child, "it is subject to be changed upon proper petition and proof." McDanielv. McDaniel, 621 So.2d 1328, 1330 (Ala.Civ.App. 1993).
Therefore, even if the parties had had a geographic restriction, when the mother requested that she be allowed to relocate, the trial court would have had the duty to determine whether the proof submitted by the mother demonstrated that the son's best interests would no longer be served by the restriction. Means v. Means, 512 So.2d 1386, 1389
(Ala.Civ.App. 1987). "The best interest standard affords freedom for the trial court to consider numerous and varied factors . . . . [T]here are no specific rules or guidelines that will control every case." Hodge v.Hovey, 679 So.2d 1145, 1148 (Ala.Civ.App. 1996). Here, the trial court permitted the mother to move with the son; the trial court restricted that right by refusing to permit the mother and son to move to the Cayman Islands. Thus, if the trial court had been considering a geographic restriction in this case, it would have necessarily determined that such a restriction did not serve the best interest of the son at this time and conversely that relocation with the mother within the United States would be in his best interest. We likely would not have disagreed with its decision, and, even if we did, we could not substitute our judgment for that of the trial court, which heard the evidence and observed the witnesses. Hodge, 679 So.2d at 1148. *Page 1176 
Accordingly, the trial court's judgment denying the father's petition for custody modification and permitting the mother to relocate, but prohibiting her from relocating to the Cayman Islands is affirmed. The appellee's request for an attorney fee on appeal is granted in the amount of $4,000.
OPINION OF AUGUST 22, 2003, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
YATES, P.J., and PITTMAN, J., concur.
THOMPSON and MURDOCK, JJ., concur in the result.
[1] The father's appeal raises issues concerning only the denial of the modification petition.